REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

CONSOLIDATED CASES

No. 2565
September Term, 2012

JOSEPH CHRISTIAN
v.
STATE OF MARYLAND

No. 1986
September Term, 2012

JAMES MILLIGAN
v.
STATE OF MARYLAND

Hotten,
Berger,
Arthur,

JJ.

Opinion by Arthur, J.

Filed: October 3, 2014

Appellants Joseph Christian and James Milligan were charged in the Circuit Court for Baltimore City with various offenses related to a shooting that was the result of a robbery gone wrong.

Specifically, Christian was charged with: (1) armed robbery; (2) conspiracy to commit armed robbery; (3) attempted first-degree murder; (4) conspiracy to commit first-degree murder; (5) conspiracy to wear, carry, and transport a handgun; and (6) use of a handgun in the commission of a felony or crime of violence.

For his part, Milligan was charged with: (1) armed robbery; (2) conspiracy to commit armed robbery; (3) attempted first-degree murder; (4) conspiracy to commit first-degree murder; (5) use of a handgun in the commission of a felony or crime of violence; (6) wearing, carrying, and transporting a handgun; (7) possession of a firearm by a disqualified person; and (8) conspiracy to wear, carry, and transport a handgun.

A joint trial commenced, at the close of which the State withdrew certain charges, and the trial court submitted certain lesser-included offenses to the jury.

The jury found Christian guilty of use of a handgun in the commission of a felony or crime of violence, first-degree assault, conspiracy to commit first-degree assault, attempted robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon.

The jury also found Milligan guilty of use of a handgun in the commission of a felony or crime of violence, possession of a regulated firearm by a prohibited person, attempted second-degree murder, conspiracy to commit first-degree assault, attempted

robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon.

Both Milligan and Christian took timely appeals, which this Court consolidated into one.

## QUESTIONS PRESENTED

Appellants together raise ten issues, which we reorder, restate, and consolidate as follows:

1. Did the trial court deny Christian and Milligan a fair trial, pursuant to *Bruton v. United States*, 391 U.S. 123 (1968), when it admitted into evidence recorded statements made by each co-defendant?

2. Did the trial court err in denying Christian's request that it admit coercive police remarks that had been suppressed?

3. Did the trial court err in instructing the jury on the intent required to convict Christian on a theory of accomplice liability?

4. Was there insufficient evidence to sustain Christian's conviction for use of a handgun in the commission of a felony or a crime of violence?

5. Did the trial court deny Milligan his right to a fair trial by limiting the scope of his closing argument?

6. Did the trial court deny defendants a fair trial by overruling their objections to statements in the State's closing argument?

7. Did the trial court err in convicting both Christian and Milligan of separate counts of conspiracy to commit

2

first-degree assault and conspiracy to commit robbery with a dangerous weapon?

8.    Should Christian's sentence for assault merge with his sentence for attempted robbery with a dangerous weapon?

For the reasons that follow, we reverse Milligan's convictions because of a *Bruton* violation. Because of our disposition of Milligan's convictions on *Bruton* grounds, we do not address his other challenges. In addition, we vacate Christian's sentence for conspiracy to commit robbery with a dangerous weapon and, for sentencing purposes, merge his convictions for first-degree assault and conspiracy to commit robbery with a dangerous weapon into his conviction for attempted robbery with a dangerous weapon. We affirm Christian's convictions in all other respects.

## FACTUAL AND PROCEDURAL HISTORY

The trial concerned a series of events that occurred on December 28, 2010, at two apartment buildings on Woodland Avenue, in Baltimore City. The events centered around four perpetrators – Christian, Milligan, Nathaniel Lounds, and Albert Parker – and their victim, Curtis Jones. The evidence adduced at Christian's and Milligan's joint trial indicated that on the date in question the four perpetrators, in various capacities, planned a robbery of Jones, who was injured when Lounds shot him with a handgun.[1]

---

[1] Before trial, Parker and Lounds pleaded guilty. The record reflects that Lounds, who was 18 at the time of the offenses in question, would receive a minimum of 10 years in prison.

3

Lounds, the shooter, lived with his older sister, Shinae "Nay-Nay" Rabey, at 3505 Woodland Avenue, Apartment 3A. Milligan lived next door at apartment 3B. Christian lived in the neighboring apartment building, 3503 Woodland, with Precious Hicks, the mother of his daughter. Christian and Milligan socialized frequently, and all four men were seen together at the apartments at various times on the day of the crime.

Jones, the victim, testified that he had known Christian from construction work they had done together. At around 11:00 a.m. on the morning of the shooting, Christian telephoned Jones, asking to buy some marijuana from him. Jones testified that he did not have any marijuana to sell to Christian, but that he nonetheless went to meet Christian at the Woodland Avenue apartments.

At around 4:00 p.m., Jones arrived at the apartments, where Christian greeted him. Christian then walked into the building at 3503 Woodland, and Jones followed him.

When Jones reached the top of the stairs inside the building, he was accosted by two men whom he did not recognize. The men told Jones to "kick it out." One of the assailants then reached for Jones's car keys and cell phone. When Jones "reached back" in response, one of the men instructed the other to "bust him" – *i.e.*, to shoot him. Jones was then shot in the chest.

Jones managed to get outside the building, where he telephoned for an ambulance. He survived the shooting, but not without surgery and considerable post-operative medical treatment.

4

Lounds, who testified pursuant to a plea agreement with the State, corroborated and supplemented Jones's testimony. Lounds told the jury that when he arrived at his apartment on the afternoon of the robbery, Christian, Milligan, and Parker were in the hallway discussing a plan to rob Christian's connection, Jones, for money and marijuana. Lounds stated that he did not know a handgun – a .357 caliber Magnum – would be involved in the robbery until Milligan handed it to him and told him that he would kill him if he did not brandish the gun in the robbery. Christian was present at that time.

Lounds testified that when Jones arrived at the apartments, Christian identified him to the others, at which point Milligan gave the gun to Lounds. He and Milligan then went from their building, at 3505 Woodland, to the neighboring building, at 3503, which Jones (following Christian) had just entered. Lounds and Milligan accosted Jones, telling him to "kick it out." When Jones did not comply, Milligan twice instructed Lounds to shoot. Lounds pulled the trigger, shaking as he did so. Lounds then went to his sister's apartment in the other building, told her that he shot someone, asked for money, and quickly fled.

Detectives McMorris and Brown were, respectively, the primary and secondary investigators assigned to the case. McMorris followed leads to Lounds's sister, Ms. Rabey, who, after being arrested for a controlled substance violation, implicated the four men, including her brother Lounds. Parker was arrested a week later, and Lounds a month after that.

After being advised of his *Miranda* rights, Lounds made two recorded statements, in which he confessed to his role in the shooting. Lounds identified Christian and the others in photo arrays and described their various roles in the event. McMorris then obtained arrest warrants for Christian and Milligan.

McMorris and Brown subsequently interviewed Christian as a suspect in the shooting. After reading Christian his *Miranda* rights, the detectives conducted a recorded interview, during which Christian confessed to his part in planning and aiding the botched robbery. Christian specifically said that the plan was for his accomplices, including Milligan, to stage a hold-up, in which they would steal the drugs from Jones and purport to steal the $125 that Christian was going to pay to Jones for the drugs. Afterward, Christian's accomplices would keep the money, Christian would get the drugs (an ounce of marijuana), and Christian would sell some of the marijuana (to get his money back) and smoke the rest. The circuit court suppressed the portion of Christian's statement that came after the detectives improperly threatened to implicate his child's mother, Precious Hicks, in the offense.

After the jury convicted Christian and Milligan, the circuit court sentenced the two co-defendants on November 19, 2012. Christian received a total sentence of 20 years' executed prison time: ten years, the first five without parole, for use of a handgun in the commission of a felony or crime of violence; ten years, to be served consecutively, for first-degree assault; ten years, to be served concurrently, for conspiracy to commit first-

6

degree assault; 20 years, to be served concurrently, all but ten suspended, plus five years

of probation, for attempted robbery with a dangerous weapon; and ten years, to be served

consecutively, all suspended, plus five years of probation, for conspiracy to commit

robbery with a dangerous weapon.

Milligan received a total sentence of 55 years' executed prison time: 20 years, the

first five without parole, for use of a handgun in the commission of a felony or crime of

violence; five years, consecutive, without parole, for possession of a regulated firearm by

a prohibited person; 20 years, consecutive, for attempted second-degree murder; 20 years,

consecutive, all but five suspended, plus five years of probation, for conspiracy to commit

first-degree assault; ten years, consecutive, all but five suspended plus, five years of

probation, for attempted robbery with a dangerous weapon; and ten years, all suspended

plus five years of probation, for conspiracy to commit robbery with a dangerous weapon.

The co-defendants now appeal to this Court.

**DISCUSSION**

I.      **The *Bruton* Challenges**

Christian and Milligan argue that the circuit court violated their rights to due

process and a fair trial under the leading case of *Bruton v. United States*, 391 U.S. 123

(1968), when it admitted pre-trial statements in which each of them directly implicated

the other.  They ask this Court to reverse the trial court's decisions.  For the reasons that

follow, we decline to do so with respect to Christian's challenge, but must do so with

7

respect to Milligan's.

Strictly speaking, the Supreme Court's holding in *Bruton* did not concern due process rights, but rather the rights of the accused under the Confrontation Clause of the Sixth Amendment to the United States Constitution, which are incorporated into the Due Process Clause of the Fourteenth Amendment.[2]  The *Bruton* Court held that at a joint trial, the admission of a non-testifying co-defendant's statement "expressly implicating" a defendant by name (*Bruton*, 391 U.S. at 124 n.1) violated the defendant's right to confrontation, even though the court had instructed the jury to weigh the evidence only as it related to charges against the co-defendant.  *See id.* at 136.  The Court explained that these direct implications are "powerfully incriminating" and stated that the "risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."  *Id.* at 135.

The Supreme Court later narrowed the broad *Bruton* ruling, holding that the admission of a defendant's confession accompanied by a limiting instruction does not violate a co-defendant's confrontation right if "the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."  *Richardson v.*

_____

[2] The Confrontation Clause and Article 21 of the Maryland Declaration of Rights guarantee a criminal defendant the right to confront the witnesses against him.  *Martinez v. State*, 416 Md. 418, 428 (2010).  Thus, "where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand."  *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).

*Marsh*, 481 U.S. 200, 211 (1987). The Court explained that a wholly-redacted statement would lack the "facially incriminatory" qualities that *Bruton* identified, and that a jury would reasonably conclude guilt only when other evidence admitted at trial links the co-defendant to the statement. In such a situation, though it may not be easy for a jury to obey the cautionary instruction, "there does not exist the overwhelming probability of their inability to do so that is the foundation of *Bruton*'s [rule]." *Richardson*, 481 U.S. at 208; *see also Gray v. Maryland*, 523 U.S. 185, 192 (1998) (admission of co-defendant's redacted confession violates *Bruton* if confession refers to existence of nonconfessing defendant by "replac[ing] a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration").

Maryland courts applying the rule from *Bruton* and its progeny have similarly denied challenges where the defendant's statement alone does not expressly implicate the co-defendant. In *Williams v. State*, 131 Md. App. 1, *cert. denied*, 359 Md. 335 (2000), this Court denied a defendant's challenge to his co-defendant's statement at trial that the defendant's "stepmother thought that he did it." *Id.* at 39. We explained that such a speculative third-party statement did not come close to raising *Bruton* concerns:

> [W]e are not dealing with a[n] assertion. . . that the appellant actually participated in the crime. We are not dealing with the circumstance described by *Bruton* as one where "the powerfully incriminating extrajudicial statements of a co-defendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial."

*Id.* (quoting *Bruton*, 391 U.S. at 135-36); *see also Payne & Bond v. State*, 211 Md. App.

9

220, *cert. granted*, 434 Md. 311 (2013) (denying *Bruton* challenge to co-defendant's statements that did not directly or indirectly refer to defendant or to anyone by name).

### 1. The Admission of Milligan's Telephone Call Did Not Deny Christian's Rights Under *Bruton*

The State introduced a recorded telephone conversation between Milligan and an unknown woman, which occurred while Milligan was incarcerated at the Baltimore County Detention Center. The State argued that the call incriminated Milligan because it reflected his concern about snitches and disclosed his intention to flee if he got out of jail. Christian asserts several *Bruton* violations as a result of the call. We are not persuaded.

Christian first challenges the following comment, by Milligan:

> Come on. If Nay-Nay [Lounds's sister, Shinae Rabey] snitching, she lives
> right next door. If Precious [Hicks, the mother of Christian's daughter]
> snitching she told them 3B. Like it ain't got nothing to do with it.

Christian argues that this almost indecipherable statement[3] directly incriminated him because the jury could have interpreted it as a statement that Precious Hicks, and therefore the father of her child, Christian, had some role in the crime. Our initial observation is that nothing on the face of this statement directly implicates Christian or, for that matter, Ms. Hicks. At most, the statement allows for the possibility that Ms. Hicks, and perhaps Christian, had (or had heard) some information about the crime. Yet,

---

[3] It is unclear whether the reference to "3B" is to Milligan's apartment number at 3505 Woodland or to Christian's apartment number at 3503 Woodland. The reference to living "right next door" means that Shinae "Nay-Nay" Rabey lived in the apartment next door to Milligan's.

10

such a potential, on its own, does not expressly implicate Christian and thus fails to raise the powerful concerns that animated the *Bruton* Court. *See Bruton*, 391 U.S. at 136.

Christian further argues that the woman caller's comment, "Precious knows your name," implied that Hicks had some knowledge of the crime. This too fails to demonstrate that the statement, on its face, directly implicates Christian in *anything*; a juror could only reasonably conclude some measure of guilt by leaps of inference made possible by outside facts admitted in evidence.

Finally, Christian asserts that *Bruton* violations occurred during two references to him by his nickname, "Rock." First, Milligan, in seeming reference to how a third party had found out about the crime, asked, "Who he say told him that?," to which the woman caller responded, "Rock." Shortly thereafter, the woman stated, "I told you they all telling. Telling everything. [Inaudible] Rock and them [inaudible]."

Christian argues that these two statements suggest that Christian had been talking about the crime and was therefore implicated in it. But although these statements refer to Christian by name (or nickname), they do not implicate him in the crime. To the contrary, Christian could well have heard and talked about the crime without having been personally involved in it. As Christian himself said in his own statement to the police, "The streets talk." Thus, the statement is a far cry from the "powerfully incriminating" direct implication that a co-defendant actually participated in a crime to which the speaker is confessing. *See Bruton*, 391 U.S. at 136-37; *Richardson*, 481 U.S. at 208.

11

Finally, we note that, in discussing the recorded conversation between Milligan and the unidentified woman, the State argued that it incriminated Milligan, not that it incriminated Christian in any way. Moreover, the court instructed the jury that it must separately consider the evidence against each defendant. Absent a clear *Bruton* violation, there exists an "almost invariable assumption of the law that jurors follow their instructions[.]" *Richardson*, 481 U.S. at 206; *see also Francis v. Franklin*, 471 U.S. 307, 325 n.9 (1985). Accordingly, we see no merit in Christian's *Bruton* challenge and hold that the trial court acted within its discretion in rejecting it.[4]

## 2. The Admission of Christian's Recorded Confession Violated Milligan's Rights Under *Bruton*

Milligan also argues a *Bruton* violation, contending that the trial court denied his right to a fair trial when, over Milligan's objection, it allowed the State to play a recording of the detectives' interview of Christian. In the recording Christian confesses to planning and participating in the robbery, and he implicates Milligan by name (or, more precisely, by nickname) in the planning. Milligan argues that Christian's statements "clearly and unequivocally implicated" Milligan and thus that their admission at his trial violated his rights under *Bruton*. We are constrained to agree.

---

[4] Although the parties did not discuss the issue, it is questionable whether *Bruton* was even implicated by the recorded telephone call between Milligan and the unknown woman. *See United States v. Smalls*, 605 F.3d 765, 768 n.2 (10th Cir. 2010) (stating that "the *Bruton* rule, like the Confrontation Clause upon which it is premised, does not apply to nontestimonial hearsay statements").

As an initial matter, however, we must confront the State's contention that Milligan failed to preserve his *Bruton* challenge. Milligan's counsel objected on the record at the time Christian's recorded confession was to be admitted:

> I understand that the court has made a ruling that this is admissible as redacted. On behalf of Mr. Milligan I just – I disagree with the court's ruling and I want to preserve the issue for appeal that – I mean, I mean my arguments remain the same. I just know that a motion *in limine* does not preserve the issue for appeal and that I am still required to object at the time the evidence is offered. . . . And so I still believe that this is violative of my rights under *Crawford*, *Bruton*, and it's inadmissible as hearsay. Although I understand that the court has earlier in this trial ruled otherwise.

Although the record does not contain the motion *in limine* that Milligan's counsel claims to have filed, the State, at trial, did not dispute that he had in fact filed such a motion. Nor did the State dispute counsel's assertion that the court had redacted the confession in some respects, apparently in a response to a motion. For its part, the circuit court certainly did not seem to be unfamiliar with the *Bruton* motion or the grounds for it when it overruled Christian's objection and allowed the jury to hear the recorded confession.

In theory, Christian's counsel could have repeated every basis for the *Bruton* challenge before the court played the recording, but he was not required to do so. Instead, he was required simply to register an objection "at the time the evidence is offered." Md. Rule 4-323(a); *see Klauenberg v. State*, 355 Md. 528, 539-40 (1999) (to preserve objection after denial of motion *in limine*, party must reassert objection when evidence is offered). Because Christian satisfied this requirement, we hold that he preserved his

13

*Bruton* challenge.[5]

On the merits, we see a *Bruton* violation because Christian's confession implicated Milligan, who was known by the nickname "Juice," in the planning and execution of the botched robbery. Among other things, Christian told the detectives that, on the morning of the robbery, he, "Juice," "Ray-Ray" Parker, and "Little Nate" Lounds were "sitting around thinking about how to get some money." Christian said that, at about 11:00 a.m. that morning, right around the time when Christian called the victim, he and Milligan were talking about "try[ing] to hustle up some money some type of way" or "to get a lick," which Christian said "mean[s] robbery." Having just identified Milligan, Parker, and Lounds as the persons with whom he was having this discussion, Christian said that "*they* was going to rob him [Jones] for the money that I gave him" and that "*they* was going to split the money." (Emphasis added.) When Christian called Jones for the ostensible purpose of setting up the drug deal, "Juice was right there," Christian said. In other words, Christian did not even have to tell Milligan that he had called the victim,

---

[5] For reasons that are completely unclear from the record, the State offered two different versions of Christian's statement at trial. One version was a highly-edited transcript of the interview with the detectives. The second was a recording of the interview, which contains many statements (both by Christian and by the detectives) that were redacted from the edited transcript. The most significant *Bruton* issues arise only in the recording, which was played for the jury. Notably, the recording also contains a number of other items of dubious admissibility, including references to Milligan's membership in the BGF gang and to Christian's prior criminal record. Again, it is completely unclear why the State offered the recording as well as the redacted and sanitized transcript.

14

Jones, to set up the deal, because Milligan "heard the conversation." Finally, Christian and Milligan were together, in the hallway by Milligan's apartment at 4:00 or 4:15 p.m. on the date of the attempted robbery, when Jones arrived, and Christian went out to meet him.

In short, Christian's confession expressly implicated Milligan, by nickname if not by name, at least in the planning, if not in the execution as well, of the crimes to which Christian confessed. For that reason, it was a *Bruton* violation to admit those portions of the confession.

Although a *Bruton* error might theoretically be harmless in some circumstances, we cannot conclude that the erroneous admission of Christian's statements was harmless beyond a reasonable doubt. *See generally Dionas v. State*, 436 Md. 97 (2013). Among other things, Christian's confession might have corroborated and reinforced the testimony of Lounds, who was subject to major impeachment because he had pleaded guilty, agreed to cooperate with the State, and received assurances of a relatively lenient sentence for the triggerman in an attempted murder (a minimum of 10 years). Because Lounds was the linchpin in the case against Milligan, it could not have been harmless error to shore up his testimony with the portions of Christian's confession that implicated Milligan as well. Accordingly, Milligan's convictions must be reversed.

## II. The Trial Court Properly Exercised Its Discretion to Exclude the Detective's Coercive Remark From Evidence

Christian's next challenge also addresses this recorded interview, wherein he

confessed to Detectives McMorris and Brown to his role in the failed robbery and shooting of Curtis Jones. Christian argues that the trial court abused its discretion in declining to admit a statement by Detective McMorris that the court previously had suppressed. We disagree.

Christian's recorded confession showed that one of the detectives had made improper, coercive remarks when he threatened to implicate the mother of Christian's daughter, Precious Hicks, in the shooting:

> BROWN: I was the one who brought her [Hicks] in here, alright.
>
> McMORRIS: And you know what, just like I tell you, it's your life, right, this is all your life. I explained that to her too because she lied. When she came in here she lied. And I told her look, you lie, there's consequences. She saw that I wasn't playing with her and told me the truth. Just like – I mean you want me to draw an extra square and put her in there.
>
> CHRISTIAN: Please don't put her down on there.
>
> McMORRIS: All right.

Before trial, the State conceded that the detective had made an improper threat and, thus, that the court should exclude every statement that Christian made thereafter. On the basis of the State's concession, the court excluded every statement that Christian made after the improper threat, as well as the threat itself.

Nonetheless, the court refused to exclude the statements that preceded the threat.

16

The court reasoned that at the suppression hearing Christian testified that he felt

threatened only when Detective McMorris alluded to involving Hicks in the case.

Moreover, Christian had testified that before the coercive remarks he was clear of mind,

that he was not intoxicated, and that he understood the *Miranda* rights that had been read

to him. As a consequence, the court allowed the jury to consider a substantial portion of

Christian's confession.

When trial commenced on September 10, 2012, Christian's trial counsel changed

direction and informed the court that he believed the detective's coercive remarks ought

to be admitted at trial. He argued that the remarks were admissible to show that the

"whole atmosphere" of the interview was coercive and that it was therefore up to the jury

to decide whether the entirety of Christian's recorded statement was in fact voluntary.

The trial court responded: "I don't see that it's relevant to the first part. [Christian's]

statement at this point is what it is. And up unto that point where the detective went afoul

of the Constitution, he [Christian] was doing fine . . . ." The court then ruled that the

coercive remarks would remain suppressed, explaining that:

> [U]sing the logic of defense counsel, the court believes [] that would
> open the door for every type of misconduct of the police department,
> whether accidental or intentional to come in. . . [I]f the court struck a
> – let's say a photographic array because it was unconstitutionally
> suggestive, if that's suppressed following your rationale, the fact that
> the police showed an unduly suggestive of [sic] photographic array
> would still come in. And I've never seen a case where that happened.

Repeating the argument that he presented at trial, Christian argues on appeal that

17

the coercive remark should have been admitted because it was relevant to the issue of whether Christian's entire statement was voluntary. We reject this reasoning and hold that the court did not abuse its discretion.

Only voluntary confessions are admissible as evidence. *Harper v. State*, 162 Md. App. 55, 71 (2005) (citing *Knight v. State*, 381 Md. 517, 531 (2004)). To be deemed voluntary, and thus admissible, a confession must satisfy the mandates of both the Constitution of the United States and the Maryland Constitution and Declaration of Rights. *Knight*, 381 Md. at 532. In order to pass federal and Maryland constitutional muster, a confession must be not only voluntary, but also knowingly and intelligently made. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Winder v. State*, 362 Md. 275, 305-06 (2001); *see also Gray v. State*, 368 Md. 529, 550 (2002) ("Article 22 of the Maryland Declaration of Rights has generally been recognized as being *in pari materia* with its federal counterparts").

Under Maryland decisional law, a two-step analysis governs decisions as to whether a statement is involuntary. *Knight*, 381 Md. at 533-34 (2004); *Winder*, 362 Md. at 309 (summarizing the so-called "Hillard" test set forth in *Hillard v. State*, 286 Md. 145 (1979)). The first part of the analysis asks whether, from an objective perspective, a law enforcement agent has made a threat or promise. *Knight*, 381 Md. at 533-34. If so, the trial court then asks whether the defendant subjectively relied on that threat or promise. *Id.* at 534. The crucial issue is thus whether there is a "causal nexus" between the police

18

misconduct and the defendant's statement. *Id.*

A "'trial court's determination regarding whether a confession was made voluntarily is a mixed question of law and fact.'" *Knight*, 381 Md. at 535 (quoting *Winder*, 362 Md. at 310). We therefore "undertake a *de novo* review of the trial judge's ultimate determination on the issue of voluntariness." *Winder*, 362 Md. at 310-11. "Although we make our own independent appraisal . . . , we will not disturb the trial court's factual findings unless those findings are clearly erroneous." *Wengert v. State*, 364 Md. 76, 84 (2001). "In addition, we view the evidence in the light most favorable to the State" as the prevailing party on the motion. *In Re Joshua David C.*, 116 Md. App. 580, 592 (1997). "Our review of the propriety of the trial court's denial of a motion to suppress evidence is limited to the record developed at the motions hearing." *Wengert*, 364 Md. at 84.

In *Knight*, the defendant had made identical statements, one before and one directly after an improper promise was made. *Knight*, 381 Md. at 536-38. The Court of Appeals reviewed Knight's contention that both statements were involuntary. The Court held that Knight's first statement was voluntary because the subsequent promise "obviously could not have caused Knight to make the [preceding] statement." *Id*. at 537. The Court also rejected the contention that Knight's second statement was involuntary: the second statement, being identical to the first, could not have been induced by the improper promise. *Id.* at 537-38. Thus, there was an absence of the required causal

19

nexus between the improper promise and the second statement. *Id.* at 538.

Here, nothing in the record indicates that the court strayed from the reach of its discretion in refusing to admit a coercive remark that the court found had no bearing on the voluntariness of the statements that preceded it. As with the prior statement at issue in *Knight*, there was no "causal nexus" between Detective McMorris's coercive remark and the entirety of Christian's prior statements. Even if we were to disagree, we would still be compelled to hold that the court was within its discretion to conclude otherwise.[6]

As there is no error, we affirm the trial court's ruling.

## III. The Trial Court Properly Exercised Its Discretion in Giving the Pattern Jury Instruction on Accomplice Liability

In prosecuting Christian for his alleged role in the failed robbery and the shooting of Jones, the State relied on a theory of accomplice liability. The trial judge thus was required to instruct the jury accordingly. At the end of trial, the judge read an instruction that tracked the pattern jury instruction on accomplice liability. The pertinent language is as follows:

---

[6] We find unavailing Christian's argument that the court erred by failing to submit to the jury all evidence the court first used to make a preliminary finding that Christian's statements were voluntary. *See Brittingham v. State*, 306 Md. 654, 666 (1986); *Day v. State*, 196 Md. 384, 399 (1950). Christian has missed the crucial fact that the trial court refused to admit the coercive remarks and Christian's later statements precisely because the court already had determined that the later statements were in fact *not* voluntary. As to Christian's earlier statements, the court found that they *were* voluntary because the coercive remarks had no bearing on statements that preceded them. The court stressed to Christian's counsel that he was free to elicit any other admissible evidence, excluding the coercive remark, that tended to show that those earlier statements were also involuntary.

20

In order to convict the defendant of the crimes indicated as an accomplice, the State must prove that the crimes occurred and that the defendant, with the intent to make the crime happen, knowingly aided, counseled, commanded, or encouraged the commission of the crime, or communicated to the primary actor in the crime that he was ready, willing, and able to lend support, if needed.

*See* Maryland Criminal Pattern Jury Instructions 6:00 (2d ed. 2012).

Christian argues that the trial court erred in instructing the jury as to the criminal intent required to convict for accomplice liability. He asserts that the trial court erroneously permitted the jury to find him guilty of attempted robbery with a dangerous weapon and use of a handgun in the commission of a felony or crime of violence, because, he says, the instruction did not state the correct *mens rea* requirement with respect to use of a handgun in the robbery. Christian specifically argues that the jury could convict him on these two charges "without having to find beyond a reasonable doubt that he knew *and intended* that the robbery was going to be committed with a handgun or other dangerous weapon." (Emphasis added.) We disagree with this characterization of the instructions and find no error.

Maryland Rule 4-325(c), which governs jury instructions in criminal cases, states: "The court may, and at the request of any party shall, instruct the jury as to the applicable law . . . ." *Id.* Judges enjoy broad discretion to determine whether to provide a party's requested instruction. *Carter v. State*, 366 Md. 574, 584 (2001). An appellate court reviewing challenged instructions will not disturb the judgment so long as the instructions given, on the whole and in context, are not misleading and "fairly cover the law."

21

*Thomas v. State*, 413 Md. 247, 257 (2010).

In determining whether the court's instruction "fairly covers the law," we first must determine the State's burden on the charge of accomplice liability. The Court of Appeals has explained that, to be guilty as an accomplice to a felony, "a criminal intent is necessary." *State v. Williams*, 397 Md. 172, 194 (2007), *overruled on other grounds by Price v. State*, 405 Md. 10 (2008) (internal quotation marks and citations omitted). When specific intent is a necessary element of the offense, as it is in the weapons charges in this case, the accomplice may have the requisite intent if he or she "entertained such an intent *or* knew that the principal in the first degree entertained such intent." *Id.* (emphasis added). "'[I]ntention' includes not only the purpose in mind but also *such results as are known to be substantially certain to follow*." *Id.* at 195 (emphasis added). Furthermore, "[w]hen two or more persons participate in a criminal offense, each is responsible for the commission of the offense *and for any other criminal acts done in furtherance of the commission of the offense* or the escape therefrom." *Id.* (emphasis added).

In other words, to sustain a charge of accomplice liability for the weapons offenses with which Christian was charged, it was not strictly necessary for the State to prove that Christian harbored a specific intent that a handgun or weapon be used in robbing Jones. Rather, it was sufficient for the State to prove (by the requisite standard of proof beyond a reasonable doubt) that Christian knew that the principals in the first degree (Lounds or Milligan) entertained such an intent. Alternatively, it was sufficient to prove (again,

22

beyond a reasonable doubt) that the use of the handgun or other dangerous weapon was a result that was substantially certain to follow in an attempt to steal illegal drugs from a drug dealer. Similarly, it was sufficient to prove (beyond a reasonable doubt) that Milligan or Lounds used the handgun or other dangerous weapon in furtherance of the commission of the robbery, an offense that Christian did intend to assist. For these reasons, it was not necessary to specifically instruct the jury that it could find Christian guilty on the weapons charges only if it found, beyond a reasonable doubt, that he had the specific intent that a handgun or dangerous weapon be used.[7]

The jury instruction in this case satisfied these requirements. Under that instruction, the jury could find Christian guilty of the weapons charges only if it found, beyond a reasonable doubt, not only that he "knowingly aided, counseled, commanded, or encouraged the commission of the crime[s]," but also that he "had the intent to make the crime[s] happen." As the given instruction "fairly covered the law," and is neither misleading nor confusing, *see Thomas*, 413 Md. at 257, we will not disturb the judgment.

## IV. The Evidence Was Sufficient to Support Christian's Conviction for Use of a Handgun in a Crime of Violence

Christian next argues for reversal of his conviction for use of a handgun in the commission of a felony or crime of violence, because, he says, there was insufficient

---

[7] In addition, the court would have to instruct the jury, as it did, that it could find Christian guilty only if it also found, beyond a reasonable doubt, that he "in some way advocate[d] or encourage[d] the commission of the crime." *Williams*, 397 Md. at 195.

23

evidence to convict. The State responds that Christian has failed to preserve this issue for appeal and that, in any event, the evidence in the record sufficed to support Christian's conviction. We shall consider each of these issues in turn.

### 1. Preservation for Appeal

The State argues that Christian introduces a basis for reversal wholly different from what he asserted at the close of his case-in-chief. Christian's counsel, as part of a motion for judgment of acquittal, argued on the record that there was insufficient evidence to convict, because "[t]here is no evidence . . . that Mr. Christian *knew* there was a gun or touched a gun." (Emphasis added.) By contrast, the basis for Christian's appeal, as discussed above, is that the State failed to produce sufficient evidence to demonstrate that he *specifically intended* for the robbery to be accomplished with a handgun. The State concludes that this change in argument suffices to render Christian's issue unpreserved and thus waived.

Md. Rule 4-324(a) requires a criminal defendant who moves for judgment of acquittal to "'state with particularity all reasons why the motion should be granted[.]'" *Starr v. State*, 405 Md. 293, 302 (2008) (quoting *State v. Lyles*, 308 Md. 129, 135-36 (1986)). He or she "is not entitled to appellate review of reasons stated for the first time on appeal." *Starr*, 405 Md. at 302 (citing *Lyles*, 308 Md. at 135-36; *Muir v. State*, 308 Md. 208, 218-19 (1986); *Graham v. State*, 325 Md. 398, 416-17 (1992)). A defendant similarly "may not argue in the trial court that the evidence was insufficient for one

reason, then urge a different reason for the insufficiency on appeal . . . ." *Starr*, 405 Md. at 303.

More generally, Md. Rule 8-131(a) provides that appellate courts ordinarily will not decide an issue not raised in or decided by the trial court. Such issues are not preserved and, with rare exceptions, are deemed to be waived. *Bryant v. State*, 436 Md. 653, 659 (2014). The Court of Appeals has stated that "'[t]he interests of fairness are furthered by requir[ing] counsel to bring the position of their client to the attention of the lower court . . . so that [it] can pass upon, and possibly correct, any errors in the proceedings.'" *Conyers v. State*, 354 Md. 132, 149 (1999) (internal quotation marks omitted) (quoting *State v. Bell*, 334 Md. 178, 189 (1994)).

Here, Christian has slightly altered the basis of his challenge to the sufficiency of the evidence. Nowhere at the time he moved for judgment of acquittal[8] did his counsel state the precise basis now asserted: that the submitted evidence failed particularly to demonstrate Christian's *specific intent* for a handgun to be used in the robbery.

Nonetheless, we believe the challenge asserted at trial is sufficiently detailed and similar in nature to avoid being waived. We view knowledge of a weapon and intent that a weapon be used as sufficiently similar shades of the required *mens rea* element, and we thus decline to adopt the State's view that Christian appeals for "reasons stated for the first time on appeal." *Starr*, 405 Md. at 302.

---

[8] Christian renewed his challenge without further comment after he rested his case.

25

## 2.    Sufficiency of the Evidence

Even with the issue preserved, Christian does not persuade this Court that the State

failed to submit sufficient evidence to convict under the theory of accomplice liability.

The applicable standard for reviewing evidentiary sufficiency is "whether, after

viewing the evidence in the light most favorable to the prosecution, any rational trier of

fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Titus v. State*, 423 Md. 548, 557

(2011).  The reviewing court will defer to any reasonable inferences the trier of fact could

have drawn from the admitted evidence.  *Holmes v. State*, 209 Md. App. 427, 437-38,

*cert. denied*, 431 Md. 445 (2013).  Thus, a court, on appellate review of evidentiary

sufficiency, will not "retry the case," *Smith v. State*, 415 Md. 174, 185 (2010), nor "re-

weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence."

*Holmes*, 209 Md. App. at 438.

Under Maryland law, a person may not use a handgun in commission of a crime of

violence or any other felony.  *See* Md. Code (2002, 2012 Repl. Vol.), § 4-204 of the

Criminal Law Article.[9]  To convict Christian as an accomplice to a violation of that

statute, the State had to prove that he assisted or otherwise encouraged the act with intent

that the act be committed, which includes knowing or having reason to know that the

---

[9] In 2010, when these offenses were committed, § 4-204 prohibited the use of a
"handgun."  As of October 1, 2011, the legislation prohibited the use of a "firearm,"
rather than a "handgun," in a crime of violence.

26

principal actor intended to use a handgun in committing the robbery. *See Williams*, 397 Md. at 194-95. Additionally, if the principal perpetrators committed an offense that was not part of any original plan, but was committed in furtherance of or escape from the planned offense, Christian could still be liable as an accomplice for that unplanned criminal act. *Diggs & Allen v. State*, 213 Md. App. 28, 82-87, *cert. granted on other grounds*, 436 Md. 327 (2013) (citing *Sheppard v. State*, 312 Md. 118 (1988)).

Here, Christian revives the argument that he unsuccessfully advanced in the preceding issue on appeal: that a finding of guilt for accomplice liability under § 4-204 requires proving that the accused specifically intended that a handgun be used in the underlying crime. Christian, however, relies on no Maryland case law, instead looking to cases from other jurisdictions that he contends support his theory that conviction requires a finding of specific intent to use a handgun. *See United States v. Lopez-Urbina*, 434 F.3d 750, 758 (5th Cir. 2005); *People v. Moore*, 679 N.W.2d 41, 50-51 (Mich. 2004). These outside cases do Christian little good in the face of a Maryland standard that, as already stated, permits a finding of guilt for accomplice liability where the defendant either intends that a handgun be used or *knows or has reason to know* that the principal actors intend to use one in furtherance of the underlying crime. *Williams*, 397 Md. at 195.

Under the applicable Maryland standard, the jury was presented with enough evidence from which it reasonably could convict Christian on a theory of accomplice liability. Specifically, the evidence adduced at trial, viewed in the light most favorable to

27

the prosecution, indicates that Christian, Milligan, Lounds, and Parker planned the robbery, and that Christian lured the victim, Jones, to the scene of the crime at Woodland Avenue. The four men waited at 3505 Woodland Avenue. When Jones arrived there, Milligan pulled a revolver from his waistband, handed it to Lounds, and insisted that he take it – all done in Christian's presence. Christian then left and headed to 3503 Woodland Avenue, drawing Jones inside and allowing Milligan and Lounds to accost him in the stairwell.

From this testimony, the jury could reasonably infer that Christian aided, commanded, counseled, or encouraged the crime of using a handgun in commission of a robbery and that he either intended for Milligan and Lounds to use the handgun or "kn[ew] or ha[d] reason to know" that they intended to do so. *Williams*, 397 Md. at 195. Moreover, there appears to be sufficient evidence from which the jury could conclude that, even if Christian held no specific intent that a handgun be used in the commission of the planned robbery, he was responsible not just as an accomplice to the robbery, but also "for any other criminal acts done in furtherance" of the commission of the robbery. *Sheppard*, 312 Md. at 121-22.

We thus defer to any such reasonable inferences from the admitted evidence, *Holmes*, 209 Md. App. at 437-38, and will not retry the case or impose our inferences where they may differ. *Id*. Accordingly, we shall affirm the trial court's decision.

**V.    The Trial Court Properly Exercised Its Discretion in Not Sustaining Two Objections Made During State's Closing Argument**

Our next issue concerns challenges to certain aspects of the State's closing argument.  Christian argues that the court erred in overruling his objection when the State's counsel explained to the jury the reason the detectives interviewing Christian declined to record their reading of *Miranda* warnings to him.  In addition, Christian challenges the court's decision not to sustain an objection when the prosecution asked the jury to decide based on what "you knew in your hearts and you knew in your minds."  We are not persuaded that the trial court committed any error.[10]

A trial court has wide discretion in determining what is allowed or excluded during closing arguments, and we will reverse a circuit court only under limited circumstances. *Wilson v. State*, 148 Md. App. 601, 653 (2002).  "[C]losing argument is a robust forensic forum wherein its practitioners are afforded a wide range for expression.'"  *Clarke v. State*, 97 Md. App. 425, 431 (1993) (quoting *Davis v. State*, 93 Md. App. 89, 124 (1992); *accord Wilson v. State*, 148 Md. App. 601, 654 (2002).  "'Generally, counsel are free to discuss the evidence and all reasonable and legitimate inferences that may be drawn from the evidence.'"  *Wilson*, 148 Md. App. at 654 (quoting *Clarke*, 97 Md. App. at 431).  "On review, an appellate court should not reverse the trial court unless that court clearly abused the exercise of its discretion and prejudiced the accused."  *Degren v. State*, 352

---

[10] Milligan had joined in the latter challenge as well, but it is unnecessary to consider his challenge because we have reversed his convictions on other grounds.

29

Md. 400, 431 (1999) (citations omitted).

We turn to Christian's first challenge. Through the testimony of Detective Brown, the State introduced Christian's recorded confession, which did not include a recording of the administration of the required *Miranda* warnings and of Christian's waiver of his *Miranda* rights.[11] Then, on recross-examination of Detective Brown, Christian's attorney initiated the following exchange:

> Q:    Can you tell the members of the jury why you thought it was not necessary to tape record Mr. Christian's Miranda warnings and his responses to those questions?

> A:    Because we were – we were – we wanted to make sure that Mr. Christian was willing to speak with us on his own behalf.

> Q:    . . . . So if he wasn't willing to speak with you[,] you would not tape record his statement, is that correct?

> A:    He would not have – we would not have interviewed him at all.

Later, at closing argument, Christian's attorney suggested that it was suspicious that the police had not recorded the *Miranda* warnings and argued to the jury that the "piece of paper" setting forth Christian's waiver of rights was not credible because that waiver had not been taped. In rebuttal argument, the prosecutor responded:

> Another illusion . . . . You were told by the detectives why these forms aren't done on tape, to protect the rights of everyone they speak to

---

[11] Despite this omission, Detective McMorris, at the start of the recorded interview, elicited from Christian a voluntary confirmation that he had been advised of his *Miranda* rights, that he had understood them, and that he had signed a statement waiving his rights and agreeing to talk to police without an attorney present.

because they can't talk to them, they can't record them until they've waived their rights.

Christian's counsel registered an objection, which the trial court overruled.

Christian now argues that the court's refusal to strike this part of the State's closing argument was prejudicial error on the grounds that, first, there was no evidence supporting McMorris's stated reason for omitting the *Miranda* warnings from the recording, and second, that McMorris's stated justification was false. Neither of these claims has any merit. First, the detective explained that he would not have interviewed Christian at all (let alone recorded the interview) unless Christian had consented. Second, Christian failed to provide any meat to the bare-bones assertion that McMorris stated falsehoods. Because the prosecutor's comment was a permissible response to counsel's insinuation that the police had some nefarious reason for not recording the *Miranda* waiver, the trial court was well within its discretion to overrule Christian's objection on the record.

Christian separately challenges the trial court's refusal to sustain an objection to a statement that the State made toward the end of its closing argument. The statement at issue is as follows:

> You know what you heard during this trial. You remember the evidence. You know when you heard Mr. Lounds speak, when you heard Mr. Jones tell you what he went through, and when you heard Mr. Christian's statement for the first time, you know what you were thinking. You knew in your hearts and you knew in your minds. Now it's time to have the fortitude to do justice –

31

Counsel promptly objected, and the trial court overruled that objection.[12]

Christian now asserts that in stating to the jury, "You knew in your hearts and you knew in your minds," the prosecutor instructed the jury to "abandon their legal duty to decide the case based on what their hearts tell them." He concludes that in allowing this harmful language the trial judge committed reversible error. We are not persuaded.

Christian relies on *Carrero-Vasquez v. State*, 210 Md. App. 504, 511 (2013). In that case, this Court addressed the defendant's challenge on appeal to the prosecutor's following request of the jury:

> The State does have a very high burden and my burden is to convince each and every one of you beyond a reasonable doubt. I am not required to prove guilty beyond all possible doubt or to a mathematical certainty. I am not required to negate every conceivable circumstance of innocence. My burden is high. I understand that. *Reasonable doubt. Trust your gut. If your gut says I think he's guilty, that's reasonable.*

*Id.* at 510 (emphasis in original).

We held that the prosecutor's remark was clearly improper; it misstated the law as to reasonable doubt by reducing to a "'gut' feeling" what this Court characterized as "an evidentiary standard that is the cornerstone of a fair criminal trial." *Id*. at 511 (citing *Ruffin v. State*, 394 Md. 355, 363 (2006)); *accord State v. Schnabel*, 127 Hawaii 432, 452 (2012) (holding prosecutor's remarks improper, where it asked jury to read jury

---

[12] We are not persuaded by the State's initial argument that counsel failed to preserve the issue for appeal. The objection on the record appears to us to be both timely and specific to the statement at issue.

instructions "but. . . [d]on't get too caught up in the mumbo jumbo of all the words but use your common sense"). We dismissed the State's argument that such admonitions constituted no more than explanation to the jury on how it should assess the credibility of the witnesses. *Carrero-Vasquez,* 210 Md. App. at 511. We explained: "Not only was there utterly nothing in this comment that related this 'gut' check to the jurors' assessment of witness credibility, but the comment plainly reduces proof 'beyond a reasonable doubt' to a 'gut' feeling." *Id.*

We reject the argument that the prosecutor here made similarly improper statements to the jury. It appears clear to us, on the face of the language used, that the State did not ask the jury to disregard the required burden of reasonable doubt or to disregard the law inherent in the trial court's jury instructions. Rather, in referring to what the jurors know in their hearts, the State was asking the jurors to recall the impact of some of the powerful evidence they heard – specifically, the testimony of the young shooter, Nathaniel Lounds, and of the victim, Jones, as well as Christian's recorded confession, in which he apologized to Jones. In referring to what the jurors know in their minds, the State was asking the jurors, in assessing that evidence, to reach a rational and intelligent conclusion. Far from instructing the jury to disregard its legal duties as finders of fact, the State here has uttered remarks concerning credibility and truth which this Court, in *Carrero-Vasquez*, acknowledged were fully appropriate for closing argument. We see no danger in the challenged remarks, and we therefore affirm the trial court's

33

refusal to sustain the objection.

## VI. The Court Erred in Convicting and Sentencing Christian on Separate Counts of Conspiracy

Christian challenges the trial court's decision to convict him of two counts of conspiracy. He argues that the separate conspiracy convictions – conspiracy to commit first-degree assault and conspiracy to commit robbery with a dangerous weapon – must be merged into one. We agree, with the qualification that, in each instance, rather than merge the sentences into one another, we shall vacate the conviction and the sentence for one of the two counts.

Maryland courts consistently define criminal conspiracy as "the combination of two or more persons, who by some concerted action seek to accomplish some unlawful purpose, or some lawful purpose by unlawful means." *Savage v. State*, 212 Md. App. 1, 12 (2013) (quoting *Mason v. State*, 302 Md. 434, 444 (1985)) (internal quotation marks omitted). The "unit of prosecution"[13] for conspiracy is "the agreement or combination rather than each of its criminal objectives." *Tracy v. State*, 319 Md. 452, 459 (1990). Consequently, a defendant may be convicted "'for more than one conspiracy'" only if "'there exists more than one unlawful agreement.'" *Savage*, 212 Md. App. at 13 (quoting *United States v. Nyhuis*, 8 F.3d 731, 734 (11th Cir. 1993)).

---

[13] A unit of prosecution is the "aspect" of a crime that was "intended" to be "punish[ed]." *United States v. Chipps*, 410 F.3d 438, 448 (8th Cir. 2005); *see also Tracy*, 319 Md. at 459.

Courts will generally find only a single conspiracy where, for instance, the accused acts pursuant to one broad agreement comprised of sub-agreements to commit distinct yet related unlawful acts. *See Tracy*, 319 Md. at 459-60 (finding that co-defendants had engaged in "one continuous conspiratorial relationship. . . to commit robbery and murder," notwithstanding a later-changed agreement as to who would carry out the acts). On the other hand, this Court has found separate and distinct agreements where, for example, the conspirators had agreed to engage in isolated schemes that were comprised almost entirely of separate actors. *Manuel v. State*, 85 Md. App. 1, 11-12 (1990).

Where the State charges multiple conspiracies, it has the burden of proving a separate agreement for each one. *Savage*, 212 Md. App. at 15 (citing 16 Am. Jur. 2d Conspiracy § 40). If the State fails to present sufficient proof of separate agreements, it follows that there is "merely one continuous conspiratorial relationship," *Vandegrift v. State*, 82 Md. App. 617, 646 (1990), or one "ongoing criminal enterprise," *Rudder v. State*, 181 Md. App. 426, 448-49 (2008), comprised of multiple acts committed in furtherance of it. Accordingly, we have held that if a defendant is convicted of multiple conspiracies when, in fact, only one was proven, the Double Jeopardy Clause has been violated. *Savage*, 212 Md. App. at 26; *see Brown v. Ohio*, 432 U.S. 161, 169 (1977) ("The Double Jeopardy Clause is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of dividing a single crime into a series of temporal

or spatial units").[14]

Here the record contains no evidence from which a trier of fact reasonably could conclude that Christian engaged in two distinct unlawful agreements: one to commit first-degree assault and another to commit robbery with a dangerous weapon. In fact, all evidence admitted at trial points to one single agreement to commit robbery, one key component of which was the use of a handgun during its commission.

More important, the State agrees that it did not meet its burden of demonstrating the existence of separate conspiracies. The State did not advance a two-conspiracy theory with respect to either defendant, but instead argued the presence of a single agreement to commit the underlying acts. Finally, the trial judge did not instruct the jury, with respect to either defendant, that it must find two distinct agreements in order to convict for separate conspiracy charges. Therefore, we cannot allow the separate conspiracy convictions to stand.

Typically, where the State fails to satisfy this burden, this Court vacates the judgment and sentence that should be merged without remanding to the trial court for a

_____

[14] The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution, applicable to the states via the Fourteenth Amendment, states: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." The clause "'provides the criminally accused with protection from, *inter alia*, multiple punishment stemming from the same offense,'" regardless of whether the offense arises from statute or from common law. *Savage*, 212 Md. App. at 15 n.11 (quoting *Purnell v. State*, 375 Md. 678, 690-92 (2003)). "[D]espite the lack of a similar clause in its Constitution, Maryland's common law provides protection from double jeopardy to the criminally accused." *Purnell*, 375 Md. at 691.

36

new sentencing hearing.  *See Washington v. State*, 200 Md. App. 641, 664 (2011); *Moore v. State*, 198 Md. App. 655, 718 (2011).  We shall do the same and shall vacate one of Christian's two conspiracy convictions.[15]

As the State only proved a single agreement to commit robbery with a dangerous weapon, Christian's conviction for that offense stands, and we vacate his conviction for conspiracy to commit first-degree assault.

## VII. Christian's Conviction for First-Degree Assault Merges with the Conviction for Attempted Robbery With Dangerous Weapon

Christian was sentenced to ten years' imprisonment for the charge of first-degree assault.  He was sentenced to 20 years, with ten years suspended, for attempted robbery with a dangerous weapon.

Christian argues that the two sentences must merge.  The State agrees, and so do we.  *See, e.g.*, *Williams v. State*, 187 Md. App. 470, 476-77 (2009) (holding that first-degree assault is a "lesser included offense" of robbery with a dangerous and deadly weapon and, on that ground, vacating the assault conviction); *see also Morris v. State*,

---

[15] As we noted in *Savage*, 212 Md. App. at 26 n.21, prior cases occasionally used the words "merge" and "vacate" interchangeably in the conspiracy context, but the mandates ordinarily have vacated one of the convictions.  *See, e.g.*, *Tracy*, 319 Md. at 460 (remanding with instructions to vacate judgment of conviction on conspiracy to commit robbery with deadly weapon); *Vandegrift*, 82 Md. App. at 646 (requiring merger of conspiracy convictions, yet stating in mandate: "Judgments and convictions for conspiracy to distribute cocaine and marijuana vacated"); *Ezenwa v. State*, 82 Md. App. 489, 504 (1990) ("Consistent with our view that conspiracy to distribute merges into conspiracy to import, we will vacate the former conviction").

192 Md. App. 1, 44 (2010) (merging conviction for first-degree assault into conviction for armed robbery and vacating sentence for assault where charges were not based on separate and distinct acts).

Accordingly, we shall merge Christian's conviction and sentence for first-degree assault into his conviction and sentence for attempted robbery with a dangerous weapon. As a consequence, Christian's sentence will amount to only ten years of executed prison time, the ten-year consecutive sentences for first-degree assault and conspiracy to commit robbery having been merged.[16]

## CONCLUSION

For the foregoing reasons, we reverse Milligan's convictions because of the *Bruton* violation, and we remand his case for a new trial. In addition, we vacate Christian's sentence for conspiracy to commit robbery with a dangerous weapon and, for sentencing purposes, merge his convictions for first-degree assault and conspiracy to commit robbery with a dangerous weapon into his conviction for attempted robbery with a dangerous weapon. Finally, we affirm the trial court's decisions on all of Christian's remaining challenges.

---

[16] In its brief, the State asserted that Christian would still have 20 years of executed time even if we merged the conviction and sentence for first-degree assault into the conviction and sentence for attempted robbery with a dangerous weapon. It is unclear how the State reached that conclusion. In any event, our computation leads to a different result.

**JUDGMENT AS TO NO. 2565 AFFIRMED IN PART AND VACATED IN PART. JUDGMENT AFFIRMED AS TO ATTEMPTED ROBBERY WITH A DANGEROUS WEAPON, FIRST-DEGREE ASSAULT, USE OF A HANDGUN IN THE COMMISSION OF A FELONY OR CRIME OF VIOLENCE, AND CONSPIRACY TO COMMIT ROBBERY WITH A DANGEROUS WEAPON. SENTENCES FOR FIRST-DEGREE ASSAULT AND CONSPIRACY TO COMMIT ROBBERY WITH A DANGEROUS WEAPON VACATED, CONSISTENT WITH THIS OPINION.**

**JUDGMENT AS TO NO. 1986 IS REVERSED AND REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. ONE-FOURTH OF COSTS TO BE PAID BY APPELLANT CHRISTIAN, AND THREE-FOURTHS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.**